UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

CLYDE J. NORWOOD, JNR,

                     Plaintiff,

    -against-                              1:10-CV-904
                                            (NAM/DRH)

OFFICER MARK MASON and CITY OF
TROY, NEW YORK,

                     Defendants.
_____

APPEARANCES:                            OF COUNSEL:

Law Office of Vincent U. Uba, Esq.         Vincent U. Uba, Esq.
750 Broadway
Albany, New York   12207
*Attorney for Plaintiff*

Ian H. Silverman                        Joshua A. Sabo, Esq.
Corporation Counsel for the City of Troy, New York  Deputy Corporation Counsel
City Hall
1776 Sixth Avenue
Troy, New York  12180
*Attorneys for Defendant*s

**Norman A. Mordue, United States District Judge**

MEMORANDUM-DECISION and ORDER

I.      INTRODUCTION

      The present action alleging violation of plaintiff's federal civil rights which also includes

intentional tort claims under New York state law arises from defendants' arrest and attempted

prosecution of plaintiff for various crimes stemming from a home invasion that occurred in

January 21, 2008, in the City of Troy, New York.  Plaintiff was positively identified by both

victims of the crime as one of the two men that broke into their home on the night in question,

pistol whipped them and robbed them at gunpoint.  Though plaintiff was indicted for the crime by

a grand jury, the Rensselaer County Court Judge assigned to the case later dismissed the charges

against plaintiff on the ground that the prosecutor improperly instructed the grand jurors regarding their obligation to issue an indictment. Plaintiff's complaint contains one federal and three state law causes of action. Plaintiff asserts that defendants violated his federal civil rights by purposefully manipulating the description of the assailants given by the victims and committed intentional torts by arresting and prosecuting him under false pretenses. Defendants move for summary judgment dismissing the complaint in its entirety. Plaintiff opposes defendants' motion.

II.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

On the evening in question, two men, posing as pizza delivery men, forcibly pushed their way into the home of Scott and Aimee Driscoll who were home with their infant daughter. One of the intruders was armed with a handgun. The assailants beat both victims and demanded $30,000.00 which they claimed Mr. Driscoll had won "on the Giants game." When the Driscolls were unable to produce the money the intruders were looking for, the two men ransacked the house and took the cash the Driscolls had on hand, jewelry and other items. Both of the Driscolls described their attackers to police as two Hispanic men, one shorter with a slender build and one taller with a heavier build. The Driscolls also stated that the two men were speaking Spanish to each other but spoke in English to them. The Driscolls also told police that the larger of the two men referred to the smaller one as "Hector" a few times. Scott Driscoll noted that the larger of the two men had a thin goatee.

Forensic examination of the crime scene revealed that although the two assailants wore gloves, one of them had left his DNA on a piece of duct tape that he ripped with his teeth when restraining Aimee Driscoll. The DNA evidence was sent to the New York State Police Laboratory for analysis and on January 7, 2009, Troy Police received notice that the sample was matched to a "John Doe" sample on file from a robbery in New York City. Police prepared

composite sketches of the two men involved in the crime from the Driscolls' descriptions.[1]  The

first "Wanted" flier read as follows:

|  |  |
|---|---|
| Age: | 15-25 |
| Gender: | Male |
| Race: | Hispanic |
| Build: | Slender |
| Height: | Short |
| Eye Color: | Brown |
| Weight: | 125-150 lbs |

The police sketch accompanying the description showed a younger male with glasses.  The

second flier prepared by police read as follows:

|  |  |
|---|---|
| Age: | 25-35 |
| Gender: | Male |
| Race: | Hispanic |
| Build: | Heavy |
| Height: | Tall |
| Eye Color: | Brown |
| Weight: | over 250 lbs |

Over the long course of investigating the crime, the Driscolls looked at "hundreds and hundreds"

of photos of light skinned Hispanic and Black males at the police station.  On the day following

the incident, Aimee Driscoll told a Sergeant O'Brien during a photo array that she recognized a

young Hispanic male named Hector Navedo Rios.  The detective assigned to the case recalled that

police were "going through all the Hectors in [their] system" and came up with that picture.

Hector Navedo Rios was described as having brown eyes and black hair.  His height was listed at

5' 6" and his weight was 175.  When Mrs. Driscoll made the identification, she merely told police

that the man in the photo looked familiar, not that he was one of the men who robbed she and her

husband.  Later, Mrs. Driscoll told police that she realized that this man worked at Verizon store

where she shopped.

---

[1] In his official statement to police, Scott Driscoll had described the larger of the two men as "about 6' 1", about 230 to 250 pounds, baggy clothes, and about 27-30 years old."  Aimee Driscoll did not provide specific details concerning her observations of the height, weight or age of her assailants in her official statement.

On March 16, 2009, over a year after the robbery occurred, defendant Mark Mason, the Troy Police detective assigned to the case, called the Driscolls and asked them to view a photo array of potential suspects in the crime.  Mason testified that a Sergeant Colaneri had originally produced a color version of the photo array, but Mason thought that the colors in the photos were "off" and he did not want to draw attention to any particular photo.  So Mason then asked Colanari to run the photo array in black and white so that "all the backgrounds" would "look the same."  Both victims positively identified plaintiff as one of their assailants.  Plaintiff's criminal history report indicated he had been convicted of attempted robbery in the first degree in 1993 and DWI in March 2006.  Plaintiff's profile described him as follows:

| | |
|---|---|
| Sex: | Male |
| Race: | Black |
| Ethnicity: | Non-Hispanic |
| Eye Color: | Brown |
| Hair Color: | Black |
| Height: | 6' 2" |
| Weight: | 275 |

The picture of plaintiff that the Driscolls identified depicted him with a thin goatee mustache and beard.  Following this positive identification, Detective Mason contacted plaintiff by leaving a message with his ex-wife.  Plaintiff thereafter called Mason and agreed to come to the police station for some questions.  Detective Mason testified that at this time he "knew of" plaintiff, having lived in the same place he did and having worked for the Troy Housing Authority.  Mason stated that he knew plaintiff had been "arrested for numerous armed robberies in the past."

According to Detective Mason, other than the fact that plaintiff was not Hispanic, he fit the description of the larger of the Driscolls' two assailants "to a T," and "look[ed] exactly like the picture" drawn by police based on the Driscolls' statements.  Mr. Norwood was 33 years old at the time the robbery occurred, 6' 2" tall and weighed 275 pounds.  Plaintiff denied being involved in the Driscoll home invasion.  Plaintiff told Mason that he had been at work at the time

the incident occurred, but Mason called plaintiff's employer and determined that the office was closed at that time.  Plaintiff then told Mason that he didn't know where he was at the time of the robbery.  When Mason asked plaintiff if he had been in "that area because there was DNA left behind," plaintiff said he might have been there in the past looking for an apartment, and that would explain why his DNA was there, if his DNA was there.  Mason noted, however, that he hadn't told plaintiff that **his** DNA was at the crime scene.  Plaintiff talked to his ex-wife on the phone during his interview with Mason and she advised him to leave the police station if he was not under arrest.  Before he left, however, he told Detective Mason he would return to provide a DNA sample and take a lie detector test.  Mason also interviewed plaintiff's girlfriend, Yaritza Morales, who said that plaintiff was not with her at the time of the incident and that he spoke "a little" Spanish.[2]

When Mason didn't hear from plaintiff, he called him and plaintiff told him to talk to his lawyer.  Mason testified that plaintiff then hired a series of three or four lawyers, the last of which finally informed him that plaintiff was not going to take a polygraph exam.  Based on the Drsicolls' positive identification of plaintiff from the photo array, defendant Mason applied for a number of arrest warrants for plaintiff on various charges including two counts of robbery in the first degree, two counts of burglary in the first degree, criminal use of a firearm and unlawful imprisonment.  Plaintiff was arrested on March 31, 2009, at his place of employment, the New York State Legislative Bill Drafting Committee, where he worked as a "strider."  Upon his arrest, plaintiff was placed on administrative leave without pay by his employer and later terminated from his job.

Following plaintiff's arrest, Detective Mason obtained a buccol swab from plaintiff and sent it to the State Police Laboratory for analysis.  Detective Mason testified that State Police

---

[2] Ms. Morales submitted an affidavit wherein she states that at no time did she tell Detective Mason that plaintiff spoke Spanish.

Laboratory procedure required his department to obtain a buccol swab from a suspect before the police would do a DNA analysis. According to Mason, it was not the policy of the Laboratory to use samples already on file of suspects as a mode of comparing DNA. By this time, Troy Police had been informed by the State Police Laboratory that the "John Doe" DNA sample found on the duct tape taken from the Driscoll crime scene matched a sample on file from an inmate named Jose Valle who was recently convicted of burglary. On September 8, 2009, plaintiff and Valle were indicted in a 42 count indictment with multiple counts of burglary in the first degree, robbery in the second degree, criminal use of a firearm, unlawful imprisonment, endangering the welfare of a child, forcible touching (as to Valle only), assault in the second degree and grand larceny in the third degree. Plaintiff requested dismissal the indictment as part of his omnibus pre-trial motion on November 20, 2009, on various grounds, including a defect in the instructions given to grand jurors by the prosecutor.

On December 16, 2009, the Troy Police received notification from the State Police Laboratory that the DNA mixture profile on the swab of duct tape from Aimee Driscoll was consistent with DNA from at least three donors, at least one of which was male, Joes Valle. The report noted that Aimee Driscoll could not be excluded as a possible contributor to the DNA mixture profile, but plaintiff could be excluded. In a supplemental report, the State Police Laboratory notified Troy Police that DNA taken from the duct tape on a red leather coaster found at the crime scene was also a match to Jose Valle.

Some time following plaintiff's arrest and indictment, Detective Mason testified that the police received a call from someone who said it was possible that someone else had been involved in the crime. After "looking into it," Mason came up with another suspect, Johnny Caceres. After speaking to the District Attorney, Detective Mason asked the Driscolls to come back into the station and look at some more photos. According to Mason, they identified Caceres

as "the other guy." There is no photo array in the record which includes a picture or description of Johnny Caceres. Detective Mason said that the Caceres matter is still an "open file" and that Caceres has not been arrested nor has an arrest warrant been issued for him. According to the limited information that Mason could provide concerning an "open" criminal file, he investigated Caceres after listening to conversations between he and Valle that seemed suspicious, but "[i]t turned out to be something completely different."

On February 2, 2010, Rensselaer County Judge Robert Jacon issued a Decision and Order dismissing the indictment based on the prosecutor's "fundamental defect in a critical instruction given to the Grand Jury" which she repeated "more than forty (40) times." Essentially, the prosecutor told grand jurors that if they found that the People had shown reasonable cause to believe that evidence existed in support of each element of each charge that they "must" indict the defendants. Judge Jacon found that the use of the mandatory word "must" violated the Criminal Procedure law which empowered a grand jury with "discretion" to indict. The court determined that this power was distinguishable from the role of a petit jury which "must" convict if the applicable standards of proof have been met. Thereafter, the court notified plaintiff that the criminal action having been "terminated in [his] favor" in accordance with Section 160.50 of the N.Y. Crim. Proc. Law and "it appearing that no other criminal action or proceeding [was] pending" against plaintiff, all official records and papers relating to plaintiff's arrest and prosecution would be sealed and all photographs and fingerprints would be returned to plaintiff.

Plaintiff's complaint contains four causes of action. The first is brought pursuant to 42 U.S.C. § 1983 and asserts that defendants violated plaintiff's rights secured by the Fourteenth Amendment to the United States Constitution. The complaint also asserts three additional claims sounding in intentional infliction of emotional distress, false arrest and malicious prosecution respectively. Plaintiff does not state specifically whether these claims are made pursuant to state

law or whether they are intended as further violations of 42 U.S.C. § 1983.  However, the Court notes that intentional infliction of emotional distress is purely a state tort claim and it is well settled that "claims for false arrest or malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are 'substantially the same' as claims for false arrest or malicious prosecution under state law." *Joacks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003) (*quoting Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir. 1996) (false arrest); *Conway v. Vill. of Mount Kisco*, 750 F.2d 205, 214 (2d Cir. 1984) (holding that 42 U.S.C. § 1988 requires the use of state law rules to determine the elements of malicious prosecution).

III.    DISCUSSION

A.    Applicable Legal Standard

Summary judgment is appropriate when there is no genuine issue with regard to any material fact, and the moving party is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Stated otherwise, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  When deciding a summary judgment motion, the Court must "resolve all ambiguities and draw all factual inferences in favor of the party opposing the motion."  *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999).

B.    Violation of Plaintiff's Federal Civil Rights

42 U.S.C. Section 1983 allows an action at law against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action."  42 U.S.C.

8

§ 1983.  Section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144, n. 3, (1979)).

In this case, plaintiff cites the Fourteenth Amendment as the substantive right at issue, but does not specifically state **which** right under the Fourteenth Amendment defendants allegedly violated.  To wit, the Fourteenth Amendment guarantees a number of rights including due process and equal protection of the laws:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Here, plaintiff asserts that his Fourteenth Amendment rights were violated when defendants "unilaterally substitut[ed] a most reliable description given by the victims of the crime; to wit, 'Two male Spanish speaking Hispanics' to more than one year after the crime 'One male English-speaking, African-American,' and furthermore failed to heed Plaintiff's plea to conduct and compare physical evidence, present or found at the crime scene.  The basis for plaintiff's Fourteenth Amendment claim is not clear from the face of the complaint.  Moreover, plaintiff's opposition to defendant's motion does not clarify the grounds for his constitutional claim.  In fact, plaintiff argues in his opposing memorandum of law that defendants violated the **Fourth** Amendment when they "adopt[ed] policies that allow[ed] police officers to independently and unilaterally alter testimonial evidence of victims of a crime as they choose."  However the complaint nowhere cites the Fourth Amendment as the source of plaintiff's civil rights claim.  It is well-settled that it is "inappropriate to raise new claims for the first time in submissions in opposition to summary judgment." *Wilson v. City of New York*, 11-CV-729, 2012 WL 1383030,

*at 2 (2d Cir. April 23, 2012).

1.    Claims Against Defendant Mason

The law is clear that personal involvement is a prerequisite to an award of damages against an individual defendant in an action arising under 42 U.S.C. § 1983. *See Williams v. Smith,* 781 F.2d 319, 323 (2d Cir. 1986). Individuals are liable under § 1983 in their personal capacity only if they were personally responsible for violating a plaintiff's rights or promulgated unconstitutional policies or plans or otherwise authorized or approved misconduct under circumstances indicating deliberate indifference. *See id.*; *see also Rizzo v. Goode,* 423 U.S. 362, 371 (1976); *Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir. 1989); *Duchesne v. Sugarman,* 566 F.2d 817, 831 (2d Cir. 1977).

In the present case, counsel for defendant Mason contends that the evidence demonstrates that Detective Mason "did not participate" in the alleged illegal conduct here because he did not choose the photos for the photo array. Defendant argues that since it was Sergeant Colinari who chose the photos for the photo array containing plaintiff's picture, the claims against Detective Mason must be dismissed. Indeed, Detective Mason testified that "Sergeant Colinari actually did this photo lineup." However, when Colinari showed the photo array to Mason, it was "in color" and "the colors were kind of off." Thus, Mason testified that "[he] made a black and white copy and I showed [Aimee Driscoll] the black and white copy." This defeats defendants' arguments concerning defendant Mason's alleged lack of personal involvement in this case.

2.    Procedural Due Process

Viewing the complaint in the light most favorable to plaintiff, the Court will analyze his Fourteenth Amendment claim under the theories of both denial of due process and equal protection. To sustain a Section 1983 claim based on an alleged violation of procedural due process, a plaintiff must show that (1) he possesses a liberty or property interest protected by the Constitution or federal statutes and (2) he was deprived of that liberty or property interest without

due process. *See Ciambriello v. County of Nassau*, 292 F.3d 307, 313 (2d Cir. 2002). A person

may bring a procedural due process claim in federal court under § 1983 if deprived of a protected

interest without due process of law by a person acting under color of state authority. *See* 42

U.S.C.A. § 1983. The fundamental requirement of procedural due process is "the opportunity to

be heard 'at a meaningful time and in a meaningful manner.' " *Mathews v. Eldridge*, 424 U.S.

319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

Here, there is no dispute that plaintiff's arrest and subsequent placement in custody

deprived him of a constitutionally protected liberty interest. However, the only procedural due

process plaintiff asserts that he was denied was the alleged failure of police to compare DNA

evidence at the crime scene with plaintiff's DNA prior to his arrest as a means of excluding him

from consideration as a suspect. First of all, plaintiff cites no legal authority for the proposition

that police were required to compare DNA samples from him on file with the State Laboratory to

DNA recovered at the crime scene prior to arresting him. Secondly, it is clear from this record

that the State police require a buccol swab from a suspect prior to conducting comparative DNA

analysis. Thus, the pre-arrest analysis requested by plaintiff was not available to police in this

case in any event.

Even if this were not true, however, it is clear from the record in this case that analysis of

the DNA at the scene, though it excluded plaintiff from consideration as the suspect who left his

DNA on the duct tape used on Mrs. Driscoll, expressly did not exclude plaintiff as a possible

participant in the crime since there were two suspects, both of whom wore gloves during

commission of the crime. Plaintiff and Valle were indicted in September 2009, and in December

2009, when the results of the DNA analysis came back, it did not persuade the District Attorney

to discontinue prosecuting plaintiff. Thus, plaintiff has failed to demonstrate how conducting the

DNA analysis prior to arrest would have adequately protected his liberty interest. *See McDonald

v. Smith*, 134 Fed. Appx. 466, 467 (2d Cir. 2005) (analyzing petitioner-appellant's claim that the

state's refusal to conduct post-conviction DNA testing deprived him of a liberty interest).

Notably, the criminal charges against plaintiff in this case were ultimately dismissed, but not on

the basis that DNA evidence excluded him as a suspect in the crime, but because the prosecution

had misinformed the grand jury regarding their obligation to indict if the applicable standards of

proof were met.  The Court finds that any possible exculpatory DNA results obtained prior to

plaintiff's arrest would not have outweighed the other inculpatory evidence supporting arrest and

prosecution of plaintiff for the crime - to wit, the Driscolls' positive identification of plaintiff as

their attacker.  Based thereupon, plaintiff's procedural due process claim stemming from the

failure of police to analyze DNA evidence from the crime scene prior to his arrest must be

dismissed.

3.    Substantive Due Process

       The substantive due process guarantee of the Fourteenth Amendment protects individuals

from "conscience-shocking" exercises of power by government actors, *see Johnson v. Newburn*

*Enlarged Sch. Dist.*, 239 F.3d 246, 252 (2d Cir. 2001), regardless of "whether the fault lies in a

denial of fundamental procedural fairness, or in the exercise of power without any reasonable

justification in the service of a legitimate government interest."  *County of Sacramento v. Lewis*,

523 U.S. 833, 845-46 (1998).  Here, plaintiff alleges that police "unilaterally substituted" the

reliable description of the assailants given by the victims of a crime for their own description of

the suspect.  However, short of plaintiff's conclusory assertions of the alleged manipulation of the

description of the assailants by police, there is no evidence that any such tampering or alteration

actually occurred.  Moreover, as discussed further below in connection with plaintiff's false arrest

and malicious prosecution claims, the record in this case demonstrates that plaintiff's arrest was

supported by probable cause and a properly obtained arrest warrant.  Thus, the Court finds that no

reasonable jury could find that the actions of the Troy Police in this case amounted to

conscious-shocking behavior.  Therefore, plaintiff's substantive due process claim must be

dismissed.

4.    Denial of Equal Protection

The Equal Protection Clause of the Fourteenth Amendment directs that similarly situated persons be treated alike. *See Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). In order to establish an Equal Protection violation based upon selective enforcement, the plaintiff must prove that (1) in comparison with others similarly situated, he was selectively treated, and (2) that such selective treatment was based on impermissible conditions such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person. *See Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000); *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 16 (2d Cir. 1999); *LaTrieste Restaurant & Cabaret, Inc. v. Village of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994); *FSK Drug Corp. v. Perales*, 960 F.2d 6, 10 (2d Cir. 1992). Plaintiff's complaint does not allege facts plausibly suggesting that he experienced invidious discrimination because of his race, national origin or gender.

However, "an individual not alleging invidious discrimination on the basis of membership in some group may nevertheless prevail on an equal protection claim under the 'class of one' theory recognized by the Supreme Court in *Willowbrook v. Olech*, 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)." *Young v. Suffolk County*, 09-CV-3325, 2010 WL 1424008, at *16 (E.D.N.Y. April 9, 2010). "Under a 'class of one' equal protection claim, a plaintiff must allege that (1) '[he] has been intentionally treated differently from others similarly situated' and (2) 'there is no rational basis for the difference in treatment.' " *Id.* (quoting *Willowbrook*, 528 U.S. at 564). "In order to state an equal protection violation under § 1983, 'it is axiomatic that plaintiff must allege that similarly situated persons were treated differently .' " *Id.* (quoting *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 193 (2d Cir. 1994)).

Here, plaintiff has not presented any allegations, much less evidence, that he was treated differently than other suspects similarly situated by the Troy Police Department. Moreover, even

if there were any such evidence in the record, it would not be sufficient to sustain plaintiff's equal

protection claim since it requires proof of disparate treatment **and** impermissible motivation. *See*

*Bizzarro v. Miranda*, 394 F.3d 82, 87 (2d Cir. 2005). "To prevail, plaintiff[] must prove that the

disparate treatment was **caused by** the impermissible motivation. [He] cannot merely rest on a

showing of disparate treatment." *Id.* (citing *Crowley v. Courville*, 76 F.3d 47, 53 (2d Cir. 1996)

("[A] demonstration of different treatment from persons similarly situated, without more, would

not establish malice or bad faith."); *Zahra v. Town of Southold*, 48 F.3d 674, 684 (2d Cir. 1995)

("The evidence suggesting that Zahra was 'treated differently' from others does not, in itself,

show malice."); *LeClair v. Saunders*, 627 F.2d 606, 610-11 (2d Cir. 1980) ("'[D]ifferent

treatment' ... do[es] not it [it]sel[f] show malice.")).  There is no evidence in the record, short of

plaintiff's inflammatory and conclusory allegations, demonstrating that the Troy Police acted with

malice or bad faith in arresting plaintiff after he was positively identified by both victims of the

crime as one of their assailants.  Thus, plaintiff's equal protection claim is bereft of merit as a

matter of law and must be dismissed.

C.      False Arrest

        Under New York and federal law, "probable cause serves as a complete defense to the

charges of false arrest and malicious prosecution." *Zanghi*, 752 F.2d at 45; *Savino v. City of New

York*, 331 F.3d 63, 75 (2d Cir. 2003).  "Probable cause is established when the arresting officer

has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable

caution in the belief that an offense has been committed by the person to be arrested." *Singer v.

Fulton County Sheriff*, 63 F. 3d 110, 119 (2d Cir. 1995); *accord Gerstein v. Pugh*, 420 U.S. 103,

111 (1975).  In evaluating probable cause, courts consider the facts available to the officer at the

time of the arrest. *Martinez v. Simonetti*, 202 F. 3d 625, 634 (2d Cir. 2000); *Lowth v. Town of

Cheektowaga*, 82 F. 3d 563, 569 (2d Cir. 1996); *see also Broughton v. State of New York*, 37

N.Y.2d 451, 458 (1975).  Normally, an arrest warrant issued from a neutral magistrate creates the

presumption of probable cause.  *See U.S. v. Ventresca*, 380 U.S. 102, 109 (1965); Golino v. City

of New Haven, 950 F.2d 864, 870 (2d Cir. 1991).

 Moreover, it is well-established that a law enforcement official has probable cause to

arrest if he received his information from some person, normally the putative victim or

eyewitness, who it seems reasonable to believe is telling the truth.  *See Daniels v. United States*,

393 F.2d Cir. 359, 361 (D.C. Cir. 1968).  The veracity of citizen complaints who are the victims

of the very crime they report to the police is assumed.  *See Adams v. Williams*, 407 U.S. 143,

146-47 (1972);[3]  "[T]he determination of probable cause does not turn on whether [the fellow

agent's] observations were accurate, but on whether [the arresting agent] was reasonable in

relying on those observations."  *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (quoting

*Bernard v. United States*, 25 F.3d 98, 102-03 (2d Cir. 1994)).

 The undisputed material facts of this case show that Detective Mason applied for an

obtained a valid arrest warrant for plaintiff prior to his arrest.  The validity of said arrest warrant

has not been called into question by any competent evidence in the record.  Moreover, the record

supports defendants' contention that probable cause existed to arrest, and prosecute plaintiff for

the crimes with which he was charged herein.  In this case, plaintiff was arrested for burglary in

---

 [3] While ordinarily the probable cause requirement is met where the arresting officer has been advised of a
crime by a person who claims to be the victim, *see Singer*, 63 F. 3d 119, it has been held that "[s]ometimes
information from or about a person claiming to be the victim of crime would lead a reasonable officer to be
suspicious, making further investigation prudent--and, because the 'reasonableness' standard of the fourth
amendment links the constitutional obligation to the standard of prudent conduct, the officer must do more." *Hebron
v. Touhy*, 18 F.3d 421, 422-23 (7th Cir. 1994).  The officer is not, however, required to "make a full investigation
into [a suspect's] state of mind prior to taking action" or to "explore and eliminate every theoretically plausible claim
of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Auth*., 124 F.3d 123, 128 (2d Cir. 1997); *Fulton v.
Robinson*, 289 F.3d 188, 195 (2d Cir. 2002) (finding ample probable cause as plaintiff "proffered no evidence to
suggest that the officers had any reason to doubt [the victim's] veracity."); *Bernard v. United States*, 25 F.3d 98, 103
(2d Cir.1994) ("probable cause exists even where it is based upon mistaken information, so long as the arresting
officer was reasonable in relying on that information"); *Gil v. County of Suffolk*, No. CV 06-1683, 2008 WL
4866036 (E.D.N.Y. Nov. 6, 2008) ("even viewed in a light most favorable to Gil, the evidence does not suggest that
it was unreasonable for the officers to believe that Short was telling the truth in positively identifying Gil as the
robber.").

the first degree, robbery in the second degree, criminal use of a firearm, unlawful imprisonment, endangering the welfare of a child, assault in the second degree and grand larceny in the third degree.  Based on the Driscolls' positive identification of plaintiff as one of the two men who broke into their house, beat them and robbed them at gunpoint in front of their infant daughter, the Troy Police, including Detective Mason were justified in arresting plaintiff for these crimes.  As a further matter, Detective Mason testified that at the time he interviewed plaintiff concerning his involvement in these crimes, he knew plaintiff had been previously convicted of robbery.  Plaintiff also initially lied to Detective Mason concerning his whereabouts on the evening of the crime and thereafter stated that he did not know where he was or who he was with on the night in question.  Detective Mason also noted that plaintiff implicated himself as having innocently left his DNA at the scene of the crime prior to its occurrence although Mason never told plaintiff that his DNA was found in the Driscolls' home.  Finally, Mason testified that although plaintiff agreed to provide a DNA sample and take a lie detector test to prove his innocence, he later refused to do so.  Coupled with the Driscolls' positive identification, there was more than ample reason to believe that plaintiff was a likely suspect.  Thus, the Court finds that defendant Mason had probable cause to arrest plaintiff and prosecute him for the crimes at issue herein.

Plaintiff's argument that he did not match the composite descriptions given by the Driscolls because he was not Hispanic and did not speak Spanish is not dispositive of the police determination that plaintiff's physical attributes matched the composite sketch "to a T" and that they had affidavits from both adult victims of the crime identifying plaintiff as one of the intruders.  Plaintiff has failed to raise any triable issue concerning the absence of probable cause for his arrest on the date in question for the charged offenses.  Consequently, defendants' motion for summary judgment on plaintiff's claim for false arrest must be granted.

D.    Malicious Prosecution

To recover on a malicious prosecution claim under New York law, a plaintiff must prove

four elements: (1) that the defendant either commenced or continued a criminal proceeding against plaintiff; (2) that the criminal proceeding terminated in plaintiff's favor; (3) that there was no probable cause for the criminal proceedings; and (4) that the criminal proceeding was instituted in actual malice. *See Broughton*, 37 N.Y.2d at 457; *Russo v. State of New York*, 672 F.2d 1014, 1019 (2d Cir. 1982). Despite defendants' arguments to the contrary, the dismissal of the criminal charges against plaintiff based on a defect in the grand jury instructions constitutes "favorable termination" for the purpose of plaintiff's malicious prosecution claims. Establishing "favorable termination" status, however, does not cure plaintiff's failure to demonstrate the absence of probable cause for the criminal proceedings against him in the first instance. As discussed at length above, there are no triable issues concerning the objective existence of probable cause to support plaintiff's arrest on the criminal charges in this case. Further, the Court can discern no evidence of malice on the part of defendants in reviewing the present record. Therefore, an award of summary judgment against plaintiff on his claims of malicious prosecution is warranted.

E.    <u>Qualified Immunity</u>

Detective Mason is also protected against plaintiff's claims of false arrest and malicious prosecution by qualified immunity. As noted recently in the Supreme Court case of *Pearson v. Callahan*,555 U.S.223, 231 (2009):

> The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity balances two important interests--the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (KENNEDY, J., dissenting) (citing *Butz v. Economou*, 438 U.S. 478, 507 (1978)

> (noting that qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law")).

555 U.S. at 231.  For example, in cases of alleged false arrest, objective reasonableness does not turn on whether probable cause in fact existed.  *See Martin v. Malhoyt*, 830 F.2d 237, 263 (D.C. Cir. 1987).  Rather, objective reasonableness can exist if it is shown  "either (a) that it was objectively reasonable for the officer to believe that probable cause existed, or (b) that officers of reasonable competence could disagree on whether the probable cause test was met." *Robison v. Via*, 821 F.2d 913, 921 (2d Cir. 1987) (citations omitted).  Summary judgment on the basis of qualified immunity is appropriate where the only conclusion a rational jury could reach is that under the circumstances it was objectively reasonable for the officer to believe there was probable cause to make the arrest or that reasonably competent police officers could disagree about the legality of the arrest.  *See Ricciuti*, 124 F. 3d at 128; *Lennon v. Miller*, 66 F. 3d 416, 421 (2d Cir. 1995).

In the circumstances presented to Detective Mason, neither plaintiff nor the Court has identified a case demonstrating a clearly established rule prohibiting him from acting as he did in this case.  *See Saucier, supra*, 533 U.S. at 208.  At the very least, defendant Mason has established that reasonably competent police officers could disagree on the question of probable cause in this case.  Based thereupon, the motion by defendants to dismiss plaintiff's claims for false arrest and malicious prosecution on the alternative ground of qualified immunity must be granted.

F.    Municipal Liability Against City of Troy

In connection with plaintiff's claim against the City of Troy, the Court finds it does not meet the criteria set forth in *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658 (1978), because he has not established any incidents or substantive facts outside of his arrest and prosecution to demonstrate a municipal policy or custom which resulted in alleged constitutional

violations.  In *Monell*, the Supreme Court reviewed the legislative history of  42 U.S.C. § 1983 and concluded that Congress did not intend to impose broad liability on municipalities.  *See* 436 U.S. at 690.  Thus, under § 1983, a municipality may not be held liable for the acts of its employees based solely on a theory of *respondeat superior*.  *See Monell*, 436 U.S. at 690-91.  It is only when the municipality, through the execution of its policies, actually deprives an individual of his constitutional rights that it is liable for the injury.  *See id.* at 692.  Moreover, it is necessary that the policy or custom be made by one "whose edicts or acts may be said to fairly represent official policy." *Id.* at 694.  Municipal liability attaches only where the decision maker possesses final authority to establish municipal policy with respect to the unlawful action of which a plaintiff complains. *See Pembaur v. Cincinnati*, 475 U.S. 469, 481 (1986).  Finally, to establish municipal liability, the policy must actually cause the violation of constitutional rights; it must be the moving force behind the violation. *See Monell*, 436 U.S. at 692.

In the instant case, review of the complaint does not reveal the alleged municipal policy at the heart of plaintiff's *Monell* claim.  Indeed, the word "policy" appears nowhere in plaintiff's complaint.  In opposition to defendants' motion for summary judgment, plaintiff has done no more than make conclusory allegations concerning the existence of an unlawful municipal policy. There is no evidence, or even any claims, that pertain directly to the policies and customs of the City of Troy.  Instead, the plaintiff simply reiterates the allegations of wrongdoing made against defendant Mason.  In so doing, plaintiff attempts to impute liability to the City of Troy for the alleged wrongdoing of its employees. As stated above, *Monell* does not allow a claim of municipal liability based upon a theory of *respondeat superior*.  Plaintiff does not allege that there was a specific municipal policy that was the root cause of his injuries, nor does he suggest that there was a custom of constitutional abuses beyond the incident alleged in his complaint. Courts that have considered the issue have held that "[s]ome degree of specificity is required in the pleading of a custom or policy on the part of a municipality.  Mere conclusory allegations

19

devoid of factual content will not suffice .... [A] plaintiff must typically point to facts outside his

own case to support his allegation of a policy on the part of a municipality." *Perez v. Murphy*,

85-CV-4481, 86-CV-232, 1987 WL 6928, at *2 (S.D.N.Y. Feb. 10, 1987) (quoting *Thurman v.*

*City of Torrington*, 595 F.Supp. 1521, 1530 (D.Conn. 1984).  For these reasons, summary

judgment shall enter against plaintiff on his claims against the City of Troy.

G.    Intentional Infliction of Emotional Distress

As a broad principle, recovery may be had for the intentional infliction of emotional

distress where "one who, without just cause or excuse, and beyond all bounds of decency,

purposely causes a disturbance of another's mental and emotional tranquility of so acute a nature

that harmful physical consequences might be not unlikely to result . . . even though no

demonstrable physical consequences actually ensue." *Green v. Leibowitz*, 118 A.D.2d 756, 757

(2d Dep't 1986) (citations and internal quotation marks omitted).  Under New York law, in order

to establish such a claim, a plaintiff must allege: "(i) extreme and outrageous conduct;  (ii) intent

to cause, or disregard of a substantial probability of causing, severe emotional distress;  (iii) a

causal connection between the conduct and injury, and (iv) severe emotional distress." *Howell v.*

*New York Post Co., Inc.*, 81 N.Y.2d 115, 122 (1993).  The gravamen of a cause of action for the

intentional infliction of emotional distress is that the conduct complained of "is especially

calculated to cause, and does cause, mental distress of a very serious kind." *Green*, 118 A.D.2d at

757 (citing Prosser and Keeton, TORTS § 12, p. 60 [5th ed], and cases cited therein).

The Court reserves no doubt that given the fact that plaintiff was ultimately deemed not to

have been involved in the crimes perpetrated against the Driscolls, his distress and indignation at

being arrested and prosecuted for these crimes is genuine.  Nevertheless, plaintiff has not

presented facts which demonstrate that the actions of the Troy Police in this case were without

cause.  Plaintiff has cited no act or failure to act by defendant Mason which could be viewed by

any reasonable person as inconsistent with the duties and responsibilities of a law enforcement

officer.  Thus, plaintiff's allegations against the defendants do not rise to the level of conduct contemplated by the tort of intentional infliction of emotional distress.  *See Howell*, 81 N.Y.2d at 123 ("Indeed, of the intentional infliction of emotional distress claims considered by this Court, every one has failed because the alleged conduct was not sufficiently outrageous . . . Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." (citations and internal quotation marks omitted)).  Based thereupon, his claim for intentional infliction of emotional distress must be dismissed.

IV.     CONCLUSION

Based on the foregoing, it is hereby

ORDERED that defendants' motion for summary judgment (Dkt. #38) is granted and plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

Date:   May 9, 2012
        Syracuse, New York

_____
Honorable Norman A. Mordue
U.S. District Judge